UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

| Present: | Hon. Michael R. Wilner, U.S. Magistrate Judge | |
|---|---|---|
| | Eddie Ramirez | n/a |
| | Deputy Clerk | Court Reporter / Recorder |
| | Attorneys for Plaintiff: | Attorneys for Defendant: |
| | n/a | n/a |

Proceedings:   FINDINGS OF FACT AND CONCLUSIONS OF LAW FRCP 52

1.  The Court conducted a bench trial in this matter on May 21, 2024. At issue was Plaintiff Ayotte's contention that he was entitled to a portion of the proceeds of Defendant Bruno's stock sale as part of his contingency fee for legal services he provided several years earlier.

2.  The Court concludes that Mr. Ayotte certainly provided advice and lawyering that benefitted Ms. Bruno considerably. However, a fair reading of the parties' fee contract does not make clear that they agreed that the lawyer would receive a portion of the client's stock sales in the future. As a result, the Court enters judgment in favor of the defense.

## Background and Key Facts

3.  The parties are familiar with Ms. Bruno's underlying employment dispute with her former employer and her interactions with Mr. Ayotte to resolve that fight. The Court takes the relevant – and relatively undisputed – facts from the parties' direct testimony declarations (Docket # 40, 43), the live cross-examination and additional in-court questioning of Mr. Ayotte and Ms. Bruno,[1] and the key documents. The parties stipulated to the admission of all exhibits. The ones mentioned in their testimony (and to which the Court attributes significance) are the parties' e-mails and texts (Exhibits 9, 11.

---

[1]   The declarations of Mrs. Ayotte (confirming the gist of a call between her husband and Ms. Bruno) and Mr. Aguilar (another employment lawyer involved in an early stage of the matter) didn't add much to the Court's understanding of the dispute. The Court and the parties jointly agreed that no cross-examination was needed of those witnesses.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

13, 14, 16, 17, 19, 21, 23), the attorney-client fee agreement (Exhibit 1), and the final separation agreement between Ms. Bruno and her former employer (Exhibit 8).

      4.     At bottom, Ms. Bruno and her former employer had a dispute regarding her termination from the company. Ms. Bruno sought to negotiate a separation based on various financial and non-financial concerns. She first consulted informally with Mr. Ayotte (a family friend who was and is an experienced employment attorney) for advice in her dealings with the company. When those dealings didn't advance, she formally hired Mr. Ayotte to represent her directly in further proceedings against the company.

\* \* \*

      5.     The parties negotiated and signed a written fee agreement. (Ex. 1.) Under the March 2019 agreement, Ms. Bruno hired Mr. Ayotte in advance of anticipated litigation or arbitration. The agreement specifically stated that Ms. Bruno sought legal services regarding her "termination from her executive position" with the company "and surrounding matters." The agreement listed those matters as Ms. Bruno's "unpaid performance bonus," a "severance" payment, and "negotiation concerning valuation and amount owed executive under equity agreement." (Id.)

      6.     That third item related to Ms. Bruno's ownership of stock in the company. According to her earlier employment agreement, she received an amount of stock that vested over a five-year period of time. In preliminary discussions with the company, there was a dispute about (a) the amount (discussed in terms of a percentage of the five-year grant) of stock she owned and (b) the value of those shares if the company was to buy them from her. The parties agree that the company had the ability to purchase those shares from Ms. Bruno at a price the company set during a 210-day period following her departure from the company. After that, the price would be subject to negotiation, tender offer, or some other pricing mechanism beyond the company's unilateral control.

      7.     The attorney fee agreement then discussed Mr. Ayotte's "hybrid" fee structure. The parties agreed to a minimal retainer and hourly fee for work performed. "In addition," Mr. Ayotte was "entitled to a percentage [understood to be 25%] of the 'total recovery'" of "all amounts received by settlement" before litigation. The total recovery also included "the reasonable value of any non-monetary proceeds." The parties further agreed that Mr. Ayotte's services would conclude upon "completing the services covered by this agreement, or by discharge or withdrawal." At that time, "all unpaid charges for fees [ ]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

will be due and payable immediately." (Id. at 4-5.) The parties entered into this agreement shortly before Mr. Ayotte began to interact directly with the company's litigation lawyers.

8. In Mr. Ayotte's closing argument to the Court (which, given his pro se status in the litigation, the Court took to be an additional statement or testimony under oath), the lawyer candidly acknowledged that he had not previously represented a client who held a stock position in the manner of Ms. Bruno. Rather, he regularly represented employees of hedge funds (or, as he put it, "private equity" people) who received large bonus / profit-sharing payoffs when their employment terminated. Mr. Ayotte rightly viewed the settlement of those types of claims – with an immediate payment to his client – as falling within the contingency fee agreement.

\* \* \*

9. Within a few weeks, Mr. Ayotte negotiated and finalized Ms. Bruno's separation agreement from the company. The highlights on the May 2019 contract: she received a sizable bonus payment, a payment for a statutory "waiting time penalty" (in lieu of a severance payment), and an acknowledgement that she retained 80% of her original stock grant. (Ex. 8 at 1, 2.) The agreement also included favorable statements that Ms. Bruno was terminated "not for cause" and the company would confirm dates of employment for a prospective employer.[2] (Id.)

10. The separation agreement had specific provisions regarding the timing and manner of the company's payments to / for Ms. Bruno. The agreement detailed that the payments to Ms. Bruno were to be mailed to Mr. Ayotte's office. So too was a check payable to the lawyer representing the 25% contingency payment to him.[3] (Id. at 1.) Notably, the agreement did not discuss the manner of future payment for Ms. Bruno's shares in the company. It also did not refer to any other payment to Mr. Ayotte (under the contingency fee agreement, or otherwise) regarding her equity in the company.

---

[2] The "not for cause" language likely helped ensure that Ms. Bruno maximized her ownership of the company stock. The "employment confirmation" provision had no obvious financial benefit, but clearly would help her obtain when she looked for a new job.

[3] The lawyer received $27,500, which represented 25% of the $100,000 gross payout to Ms. Bruno.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

\* \* \*

11. In March 2022, Ms. Bruno told Mr. Ayotte that her former employer had been bought out. As a result, she was able to sell her vested shares for about $1.8 million. (Ex. 9 at 30.) That was vastly above the figures that were bandied about during her negotiations with her former employer.

12. Shortly afterward, Mr. Ayotte asserted to Ms. Bruno that the fee agreement "specifically covers the equity shares and states that I am entitled to 25% of all amounts received through any settlement, including the eventual equity buyout." (Ex. 21.) By his calculation, this was about $480,000 (plus interest). That claim is the basis for the current litigation.

13. However, according to the testimony at trial and the e-mails / texts exchanged between the parties, there was no overt discussion of Mr. Ayotte receiving payment from or for Ms. Bruno's shares after the conclusion of the separation agreement. He sent her no bill, invoice, or other communication (before or after the negotiations with the company) indicating that she potentially owed him further fees. Additionally, there is no evidence that Mr. Ayotte monitored the status of the company, its potential sale to a buyer, or the ongoing value of Ms. Bruno's shares.

14. It's also undisputed that Mr. Ayotte did not learn that a buyer had acquired the company – and ultimately paid a hefty sum to Ms. Bruno for her shares – until she called Mr. Ayotte to let him know. Other than a brief exchange as the 210-day deadline approached, Ms. Bruno sought no advice from Mr. Ayotte regarding any employment issue after the conclusion of the separation agreement here. Meanwhile, during her employment and until the time she sold her shares, Ms. Bruno testified that she reported the stock shares on her tax returns and paid some (unknown) amount of federal tax on them.

### Key Legal Principles

15. The legal issues at play in this breach of contract action are not complicated. Both parties agree that, under California law (applicable to this diversity action), fee agreements between lawyers and clients "are evaluated at the time of their making and must be fair, reasonable, and fully explained to the client. Such contracts are strictly construed against the attorney." M'Guinness v. Johnson, 243 Cal. App. 4th 602, 617

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

(2015); Lu v. Deng, No. CV 16-7283 CAS (RAOx), 2017 WL 4269137 at *10 (C.D. Cal. 2017) (same). (Docket # 38 at 8; # 37 at 11 (parties' trial briefs).)

     16.    When there is a dispute over the meaning of a term in a contract, the "first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over." Oceanside 84 Ltd v. Fidelity Federal Bank, 56 Cal. App. 4th 1441, 1448 (1997). If there is ambiguity in the meaning of a term, a court must discern the intent of the parties from the text of the agreement and extrinsic evidence. Id. More directly, "[a]n ambiguity in an engagement letter must be construed in favor of the reasonable expectations of the client." Netlist, Inc. v. SK Hynix, Inc., No. SA CV 16-1605 JLS (JCGx), 2016 WL 8905079 at *4 (C.D. Cal. 2016) (citing M'Guinness).

### Analysis

     17.    The Court concludes that the parties' attorney fee agreement did not clearly, unambiguously, or fairly contain a provision extending the contingency fee arrangement to the future sale of Ms. Bruno's stock.

     18.    Mr. Ayotte and Ms. Bruno undoubtedly agreed that the lawyer would represent her in negotiations or litigation regarding her claim to the company stock (and other issues). However, the scope of the lawyer's potential payment was expressly limited to amounts received in a settlement, arbitration award, or court judgment. Moreover, it's pretty obvious that his litigation / negotiation work was completed around the time of the May 2019 agreement. His entitlement to payment for services rendered – be it under his hourly rate or the percentage-of-recovery provision – expired at that point.

     19.    However, the fee agreement was silent regarding any interest that Mr. Ayotte could have in deferred compensation or later payment to Ms. Bruno after the completion of the separation agreement. The agreement definitely did not "fully explain[ ]" that Ms. Bruno would be on the hook for future payments to her former lawyer even after he stopped representing her in proceedings against the former employer. M'Guinness, 243 Cal. App. 4th at 617. On that basis, the Court concludes that the agreement was not "reasonably susceptible" to Mr. Ayotte's I'm-owed-a-portion-of-the-stock-until-the-end-of-time interpretation. Oceanside 84 Ltd, 56 Cal. App. 4th at 1448.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

20. At best, Mr. Ayotte could potentially lay claim to the "reasonable value" of the "non-monetary proceeds"[4] of the stock grant that the company acknowledged in the separation document. But what was that value at the time of the settlement agreement? The disputants exchanged various numbers about the stock's value during the negotiations. None of the valuations sounds fair or was presented to this Court with any objective evidentiary support. That's because the value of the unsold, illiquid stock in this privately-held company was deliberately left unexamined. The company didn't exercise its right to repurchase the stock at a valuation it could set at or around the time of the separation agreement in May 2019. And Ms. Bruno (here, on the advice of Mr. Ayotte and his colleague) decided to lay low until after the repurchase window closed.

21. Moreover, the parties frankly acknowledged that the shares could plausibly die a zero-value death if the company went out of business or was never sold. As a result, none of the participants convincingly establishes the reasonable value – if any – those shares had at the time of the settlement. 25% of we-don't-know is $0.

22. In addition, the actions of Mr. Ayotte and Ms. Bruno do not objectively give rise to an inference that the lawyer and client intended the contingency agreement to extend to the stock. I disagree with, and respectfully disbelieve, Mr. Ayotte's contention that the fee agreement "specifically cover[ed]" the stock grant. When questioned about that at trial, Mr. Ayotte pointed to the provision regarding the scope of his anticipated legal services. That does not equate to an agreement for payment based on the later stock transaction. His interpretation of the contract falls flat.

23. There is also nothing remotely clear on the topic in any of the parties' e-mails and texts from late 2018 or early 2019. Plus, the final separation agreement between Ms. Bruno and the company <u>did</u> contain details regarding the payment of Ms. Bruno's bonus/waiting time penalty in a manner that expressly protected Mr. Ayotte's right to receive payment from those sums. There was no comparable payment mechanism for the stock payment.

24. I understand that the Ayotte-Bruno strategy was to (a) lay low for a while, (b) hope the company would ignore the stock repurchase deadline, and (c) allow the shares to increase in the future. Even so, though, the separation agreement overtly dealt with

---

[4] The parties offered no explanation of the meaning of this term. A likely interpretation could be if the settlement agreement included, say, the transfer of a corporate car or club membership to the terminated employee.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 22-7667 MRW | Date | June 17, 2024 |
|---|---|---|---|
| Title | Ayotte v. Bruno | | |

her ownership of the shares. I see no reason why a well-crafted settlement agreement couldn't include comparable details regarding future repurchase. That would've served all the parties. The absence of the parallel details strongly suggests that Mr. Ayotte and Ms. Bruno contemporaneously believed that he was not to be paid from the stock proceeds in the future – or, at least, that he didn't tell the company (in the same way that he did disclose the contingency deal for the cash settlement). The further absence of any provision in the fee agreement or the separation contract to deal with Ms. Bruno's ongoing tax issues (and whether, when, and how Mr. Ayotte would be on the hook for his allegedly anticipated portion) also weighs against his post-hoc claim.

25.   Finally, Mr. Ayotte's sheepish concession during closing argument compels judgment in favor of Ms. Bruno. This experienced and talented employment lawyer essentially admitted that he hadn't previously represented a terminated executive who held stock or options in her/his former company. When Mr. Ayotte punched up a form fee agreement to cover his retention for Ms. Bruno, it was the first time he did so in a situation involving such a buyout situation. If the lawyer hadn't expressly envisioned how to handle this outcome, the client surely hadn't either. The ambiguous agreement must be construed against Mr. Ayotte. M'Guinness, 243 Cal. App. 4th at 617; Lu, 2017 WL 4269137 at *10; Netlist, Inc., 2016 WL 8905079 at *4.

\* \* \*

26.   There are certainly some equitable factors in Mr. Ayotte's favor. One might conclude that Ms. Bruno seriously manipulated her family friend. She tried to get some freebie legal advice from him, and then tried to negotiate his fee lower when she did agree to pay him. And, at the end of the day, she did get value from the company on the stock issue as a result of the lawyer's negotiating ability.

27.   But the claim here isn't for quantum meruit or a reasonable apportionment for services provided. It is for breach of a legal agreement. Mr. Ayotte's attempt at a landgrab fails as a matter of law and fact.

### Conclusion

28.   The Court finds in favor of Defendant Margaret Bruno and against Plaintiff Michael Ayotte. Judgment will be entered separately. The defense may seek to tax costs in a manner consistent with the Federal Rules of Civil Procedure and the Local Rules of Court.